IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

| | | |
|---|---|---|
| ESTELLE LYN FINNEY, | ) | |
| | ) | |
| Plaintiff | ) | Civil No. 10-6030-HU |
| | ) | |
| v. | ) | FINDINGS AND |
| | ) | RECOMMENDATION |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

HUBEL, Magistrate Judge:

Plaintiff Estelle Finney ("Finney") seeks judicial review of the Social Security Commissioner's final decision denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income under Titles II and XVI of the Social Security Act ("Act"). This court has jurisdiction under 42 U.S.C. § 405(g).

For the following reasons, I recommend the Commissioner's decision be REVERSED and REMANDED for further proceedings.

## PROCEDURAL BACKGROUND

Born in 1975, Finney alleges disability since August 28, 2007 (Tr.[1] 115), due to Stickler's syndrome,[2] accompanied by a heart condition, hearing loss, eye problems, bone spurs, and a learning disability.   Tr. 136.   The Commissioner denied Finney's applications initially and upon reconsideration. Tr. 44-66. An Administrative Law Judge ("ALJ") held a hearing on September 22, 2009 (Tr. 22- 43), and subsequently found Finney not disabled on October 9, 2009.  Tr. 12-21.

## FACTUAL BACKGROUND

I.    **Medical Evidence**

A.    **2005-2006**

The record before this court opens December 29, 2005.  An electrocardiogram performed on this date showed a "normally functioning mitral valve repair without evidence of regurgitation," left ventricular function "at the lower limit of normal with visually estimated ejection fraction of 50%," "normal right-sided pressure," and no pericardial effusion.  Tr. 253.

On July 28, 2006, Megan Spor, M.D., conducted an annual exam.  Tr. 214.  Dr. Spor noted

---

[1]Citations "Tr." refer to indicated pages in the official transcript of the administrative record filed with the Commissioner's Answer on July 7, 2010 (Docket #12).

[2]Stickler's syndrome is a "group of hereditary conditions characterized by a distinctive facial appearance, eye abnormalities, hearing loss, and joint problems.  The signs and symptoms vary widely among affected individuals."  *See* "Stickler Syndrome," Genetics Home Reference, National Institute of Health ("NIH") (available at http://ghr.nlm.nih.gov/condition/stickler-syndrome) (last visited April 25, 2011).  The condition often includes hearing loss, scoliosis, and skeletal abnormalities affecting joints.  The joints of affected young adults may be loose and hypermobile, and arthritis often appears at an early age. *Id.*

2 - FINDINGS AND RECOMMENDATION

Finney's history of mitral valve prolapse and repair, temporomandibular joint disorder with jaw surgery in 1996, bilateral tubal litigation in 2000, Stickler's syndrome, and spina bifida with secondary hearing loss.  Tr. 214.  Dr. Spor noted that Finney was not wearing her hearing aids because she could not afford batteries, and made no additional abnormal findings upon examination. *Id.*

Dr. Spor saw Finney again on August 24, 2006, and diagnosed acute muscle strain of the neck and shoulders.  Tr. 213.  Dr. Spor prescribed Skelaxin and ibuprofen, and recommended stretching.  *Id.*

Finney began treatment with Dorothy Albrecht, FNP, on September 20, 2006, when Finney complained of severe chest pain.  Tr. 212.  *Id.*  Albrecht noted that Finney had a mitral valve prolapse and corrective surgery in 2000, and cited the results of Finney's December 29, 2005, electrocardiogram.  *Id.*  Albrecht instructed Finney to continue taking Toprol XL,[3] Lexapro,[4] and Ranitidine,[5] ordered lab studies and stated that another electrocardiogram was warranted.  *Id.* Albrecht also noted Finney's hearing loss, which she thought was secondary to spina bifida, and stated that Finney's gastric reflux was worsening.  *Id.*  Also during this visit, Albrecht reported that Finney was "in a hurry to get back to work."  *Id.*

---

[3]Toprol is a beta blocker medication used to treat high blood pressure, prevent chest pain, improve survival after a heart attack, and, in combination with other medications, to treat heart failure. *See* "Toprol," Drugs and Supplements, NIH (available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000795/) (last visited April 26, 2010).

[4]Lexapro is a selective serotonin reuptake inhibitor used to treat depression and generalized anxiety disorder.  *See* "Lexapro," Drugs and Supplements, NIH (available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000214/) (last visited April 26, 2010).

[5]Ranitidine is an H2 blocker used to treat GERD.  *See* "Ranitidine," Drugs and Supplements, NIH (available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000094) (Last visited April 26, 2010).

Albrecht next saw Finney on September 28, 2006, when Finney again reported chest pain, without shortness of breath.  Tr. 211.  Albrecht noted palpable lumps on Finney's sternum, which she believed was sternal wire remaining from Finney's open-heart surgery in 2000.  *Id.*  A chest x-ray showed that the sternum wires "are sticking out, especially the top 2," and Albrecht concluded this was likely the source of Finney's discomfort.  *Id.*  Finney also reported a bad taste in her mouth, which Albrecht felt was likely acid reflux.  *Id.*  Albrecht diagnosed chest pain with a history of mitral valve repair, and gastrointestinal reflux disease ("GERD").  *Id.*  She prescribed Prilosec[6] and scheduled an echocardiogram.  *Id.*

A chest x-ray on September 29, 2006, showed "essentially unremarkable chest without evidence of active cardiopulmonary disease." Tr. 242.  An electrocardiogram performed on October 9, 2006, showed mitral valve repair, with "trace mitral regurgitation and this appears to be a very good result."  Tr. 250.  The electrocardiogram also showed that left ventricular function was at the lower limit of normal, and that no pericardial effusion was visualized.  *Id.*  Right-sided pressure was normal.  *Id.*

On October 12, 2006, Finney reported that her stomach symptoms were better with medication.  Tr. 211.  Laboratory tests on this date showed anemia, but were otherwise normal.  *Id.*  Albrecht also cited Finney's October 9, 2006, electrocardiogram results, and again noted that Finney's sternum wires were palpable under her skin.  *Id.*  Albrecht diagnosed a history of mitral valve prolapse and surgery, Stickler's syndrome, GERD, and anxiety.  Tr. 210.

On November 1, 2006, Finney reported that she "feels really bad" with headache, sore throat,

---

[6]Prilosec (omeprazole) is a proton-pump inhibitor used to treat GERD.  *See* "Omeprazole," Drugs and Supplements, NIH (available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000936) (last visited April 26, 2011).

chest pain with coughing, and fatigue.  Tr. 209.  Albrecht noted that Finney "did go to work today."

Tr. 209.  Albrecht diagnosed pneumonia with fatigue, and noted Finney's history of mitral valve

repair.  *Id.*  A chest x-ray on this date showed the "cardiomediastinal silhouette and pulmonary

vasculature are within normal limits," and that "there has been interval removal of the four upper

midsternal wires," and that "four lower midsternal wires remain in place."  Tr. 240.  The x-ray also

showed mild spurring in the midthoracic spine.  *Id.*

Albrecht saw Finney again on November 3, 2006, and noted that Finney was "much better"

and had returned to work.  Tr. 209.  Albrecht diagnosed anemia and resolving pneumonia and

bronchitis.  *Id.*

Finney saw Albrecht again on November 9, 2006, for follow-up after surgical removal of her

sternum wires.  Tr. 208.  Albrecht noted that the wound was healing, and diagnosed bronchitis and

anemia. *Id.*  She also limited Finney to lifting no  more than five pounds, and advised her stay off

work for one week to minimize risk of infection as her post-surgical wound healed.  *Id.*

Albrecht diagnosed jaundice and again diagnosed anemia on November 17, 2006.  Tr. 207.

On December 11, 2006, Albrecht noted a "questionable sleep disorder" and ordered an overnight

pulse oximetry study.  *Id.*  Albrecht saw Finney again on December 18, 2006, and diagnosed a sleep

disorder based upon Finney's reports of her boyfriend's observations.  Tr. 206.  Albrecht also

diagnosed gastroenteritis on this date.  *Id.*

**B.    2007**

Albrecht saw Finney again on January 8, 2007.  Finney reported three to four weeks of

abdominal pain.  Tr. 205.  Albrecht diagnosed probable bacterial vaginosis.  *Id.*  On January 18,

2007, Albrecht revised her diagnosis to diverticulitis.  *Id.*  Finney reported being unable to take

medications as prescribed because she could not afford to pay for them. *Id.*

On February 7, 2007, Albrecht noted that Finney reported a headache and trouble sleeping. Tr. 204. Albrecht diagnosed anxiety and depression with insomnia and prescribed trazadone. *Id.*

Albrecht saw Finney again for abdominal pain on February 14, 2007, and this time diagnosed GERD related to anxiety and caffeine intake. Tr. 203. Albrecht prescribed Prilosec and Ranitidine, and advised Finney to change her caffeine intake before she would refer Finney to a gastroenterologist. *Id.*

Finney received an audiological exam showing significant hearing loss on March 8, 2007. Tr. 193. On March 17, 2007, Finney again complained of stomach pain and Albrecht noted that Finney had a positive H pylori test result. Tr. 202. This time, Albrecht diagnosed H pylori, peptic ulcer disease, GERD, and anxiety in explanation for Finney's stomach pain. *Id.*

On March 28, 2007, Albrecht noted that Finney "informs me that she's had a migraine for 5 days." Tr. 201. Albrecht believed this was a tension headache, rather than a migraine. *Id.*

Finney visited the Emergency Room on April 17, 2007, complaining of rapid heartbeat, fatigue, and shortness of breath with exertion. Tr. 263. Physicians diagnosed supraventricular tachycardia and doubled her Toprol prescription. Tr. 264.

Finney saw Albrecht again on May 3, 2007, and reported the April Emergency Room visit to her. Tr. 200. Albrecht diagnosed "PSVT" (paroxysmal supraventricular tachycardia), H pylori, and peptic ulcer disease. *Id.* Albrecht again treated Finney on May 31, 2007, and noted that Finney reported mid-back pain. Tr. 199. Albrecht again noted Finney's history of open heart surgery, that Finney's sternal wires were "intact" upon examination, and diagnosed thoracic strain with thoracic bone spurs. *Id.*

6 - FINDINGS AND RECOMMENDATION

On June 7, 2007, Albrecht treated Finney for cellulitis on her hand.  Tr. 198.  Albrecht also diagnosed bronchitis and prescribed Keflex.  *Id.*  Albrecht continued to treat Finney's cellulitis on June 14, 2007, and also noted H pylori peptic ulcer disease.  Tr. 197.

Albrecht again noted Finney's reports of stomach pain on July 18, 2007, and diagnosed GERD, peptic ulcer disease, pelvic pain due to an ovarian cyst and "probable vaginal candida," Stickler's syndrome, and anxiety.  Tr. 196.  She prescribed Ranitidine and diflucan.  *Id.*  Albrecht also counseled Finney at length regarding her Stickler's syndrome.  *Id.*

An unspecified radiological gastrointestinal study on July 24, 2007, was within normal limits. Tr. 256.  A pelvic ultrasound on December 4, 2007, showed mild free fluid, "probably physiologic," but was otherwise negative.  Tr. 368.

### C.    2008

Disability Determination Services ("DDS") reviewing physician Richard Alley, M.D., completed a residual functional capacity assessment on January 31, 2008.  Tr. 270-77.  Dr. Alley found that Finney could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, and assessed no limitations in pushing, pulling, or operation of hand and foot controls.  Tr. 271.  Dr. Alley assessed no postural, manipulative, visual, hearing, or environmental limitations.  Tr. 274.  Dr. Alley noted that Finney alleged disability due to Stickler's syndrome, hearing, vision, and cardiac problems, bone, stomach, and sleep problems, and a learning disability.  Tr. 277.  He also specifically noted that a hearing examination showed that Finney's word recognition for her right ear was 76%, and that it was 44% for her left ear.  *Id.*

A psychiatric review form completed by DDS psychologist Dorothy Anderson, Ph.D., on

the same date, showed no severe mental impairments.  Tr. 278-91.

Finney presented to the Emergency Room on March 18, 2008, and was diagnosed with bronchitis.  Tr. 370-72.

Finney established care with Frances Spiller, D.O., on June 16, 2008.  Tr. 340-44.  The chart note indicates that Dr. Spiller practiced in conjunction with nurse Albrecht.  Tr. 340.  Dr. Spiller noted Finney's history, and diagnosed Stickler's syndrome, bone pain, history of mitral valve replacement, and hearing loss due to Stickler's syndrome.  Tr. 343.  Dr. Spiller recommended "nonweight bearing aerobic exercise."  *Id.*

Finney again met with Dr. Spiller on July 17, 2008, for completion of various forms associated with her present application for benefits.  Tr. 334-35.    Dr. Spiller first completed an RFC form.  Tr. 312-13.  Dr. Spiller wrote that she had been Finney's primary care provider since June 16, 2008, and that Finney carried diagnoses of Stickler's syndrome, mitral valve abnormality, spina bifida, weakened joints, and bone pain.  Tr. 312.  She stated that Finney's prognosis was "poor - this is a gradually progressive illness with no cure."  *Id.*  Finney's symptoms include bone pain, fatigue, severe joint pain, hearing loss, shortness of breath, and weak joints.  *Id.*

Dr. Spiller indicated that Finney could sit thirty minutes at one time and three hours in an eight-hour day.  *Id.*  She could stand or walk ten minutes at one time and one hour in an eight-hour day, and requires unscheduled breaks, every fifteen to thirty minutes, lasting ten to fifteen minutes. *Id.*  Dr. Spiller indicated that Finney could occasionally lift up to twenty pounds, and never lift more than this.  Tr. 313.  Dr. Spiller indicated that Finney could grasp, turn, or twist objects with her hands, perform fine manipulation with her fingers,  or reach no more than 20 percent of an eight-hour day.  *Id.*  Finally, Dr. Spiller wrote that Finney would be absent more than four times per month,

and "is not malingering." *Id.*

Also on July 17, 2008, Dr. Spiller completed two forms relating to the Commissioner's listings. Tr. 315-17. On the first, Dr. Spiller indicated that Finney's Stickler's syndrome resulted in a disorder of the spine, with compromised nerve root, neuro-anatomic pain distribution, limited range of spinal motion, motor loss associated with muscle weakness, and sensory loss. Tr. 315. Dr. Spiller also indicated that Finney has "painful dysesthesia" and "needs to change position or posture more than once every two hours." *Id.* On the second form, Dr. Spiller concurrently indicated that Finney has a history of joint pain, swelling, and tenderness, signs of joint inflammation, deformity of two or more major joints, and inability to effectively perform fine and gross movements. Tr. 317.

Dr. Spiller referred Finney for a rheumatology consult on July 24, 2008. Tr. 352-53. Rheumatologist John Ladd, M.D., noted Finney's history of Stickler's syndrome, hearing impairment, scoliosis, and mitral valve surgery. Tr. 352. Dr. Ladd's initial review reported that Finney had "joint symptoms with arthralgias," and astigmatism in both eyes. *Id.* He also noted that Finney has a "fairly marked hearing deficiency and uses hearing aids." *Id.* Regarding Finney's medications, Dr. Ladd wrote that Finney reported taking Toprol-XL and "marijuana in the evenings sometimes which seems to help." *Id.*

Dr. Ladd's examination showed normal cervical flexion and extension, clear lungs, and normal sinus rhythm of the heart, without murmurs or peripheral edema. *Id.* Dr. Ladd noted, "the chest wall shows that she has a little flaring of the possible margin and some tenderness on the left side at the 10th rib at the costochondral junction." *Id.* Dr. Ladd made detailed findings regarding Finney's hands: "Examination of the hands shows that she has fairly long fingers. Only a mild degree of hyper extension. She has flexion contractures of the fifth proximal interphalangeal joint

bilaterally.  Otherwise she has full range of motion with 100% fist bilaterally.  The wrists are normal." Tr. 352-53. Dr. Ladd also found that Finney's elbows "show slight hyper extension" with normal motions, and that her shoulders show normal range of motion. Tr. 353.  He also found a little hypermobility of Finney's ankles, normal flexion of her knees without swelling or effusion, and normal range of motion of her hips.  *Id.*

Dr. Ladd noted Finney's Stickler's syndrome diagnosis, and stated, "This is a condition where there is a defect in type II collagen as well as possibly some other problems.  It is an autosomal-dominant heredity pattern."  *Id.*  He concluded, "patients of this syndrome are prone to develop osteoarthritis.  I do not see that she has evidence of that at this point.  I think the osteoarthritis is probably on the basis of hypermobility and on the basis of primary problem with the articular cartilage, because of the lack of type II collagen." *Id.*  Regarding treatment, Dr. Ladd wrote, "I think one could hope to decrease the hypermobility problem by maintaining good muscle tone to give some support to the joints, which they do not receive from the ligaments."  *Id.*  He stated that no current treatment addresses the underlying collagen disorder, but that gene therapy might in the future.  Dr. Ladd concluded, "I have encouraged her to do isometric and semi-isometric exercises to try and strengthen the muscles around the knees and the ankles particularly and also for her back." *Id.*

On August 1, 2008, Dr. Spiller diagnosed irritable bowel syndrome, and prescribed Bentyl.[7] Tr. 339.  Dr. Spiller saw Finney again on September 26, 2008, and noted a polyp on Finney's tongue, which she believed was "likely benign."  Tr. 337.  Dr. Spiller also noted Finney's report of lower

---

[7]Bentyl (dicyclomine) is anticholinergic used to treat irritable bowel syndrome. *See* "Dicyclomine," Drugs and Supplements, NIH (available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000810) (last visited April 26, 2011).

extremity pain upon cold air exposure, and diagnosed Raynaud's syndrome.[8]   Tr. 336-37.

####    D.    2009

An echocardiogram on January 5, 2009, showed "normal chamber dimensions, wall thickness, and contractility" with an ejection fraction of 65%.   Tr. 354.   The study also showed "successful mitral valve repair with trace regurgitation," and trace tricuspid regurgitation.   *Id.*

On February 2, 2009, Dr. Spiller, now identified as Finney's primary care provider, diagnosed headache and prescribed a Toradol[9] injection with Phenergan for nausea, and Vicodin. Tr. 332.

On February 13, 2009, Kerry Woelfle, Nurse Practitioner, diagnosed pneumonia.   Tr. 330. A chest x-ray on this date showed "minimal infiltrate within the right lower lobe."   Tr. 345.

Dr. Spiller assessed right-sided rib pain on February 22, 2009.   Tr. 362.   Dr. Spiller wrote, "right third rib popped out of the sternal articulation joint with posterior displacement."   *Id.*   She also diagnosed right knee pain "due to trauma during fall" on this date.   *Id.*

On March 24, 2009, Dr. Spiller wrote a letter to the record.   Tr. 364.   Dr. Spiller wrote that Finney carries a Stickler's syndrome diagnosis, and that this is "a chronic autosomal-dominant hereditary illness where there is a defect in type II collagen.   Stickler's syndrome refers to disturbances of the connective tissue, mainly in the osteoarticular, auditory and visual systems."   *Id.*

---

[8]Raynaud's syndrome is a rare disorder causing restricted arterial blood supply to extremities.   The cause is unknown, but cold temperature or stress may trigger "attacks" which restrict blood supply to the affected body part.   "What is Raynaud's," NIH, (available at http://www.nhlbi.nih.gov/health/dci/Diseases/raynaud/ray_what.html) (last visited July 1, 2011).

[9]Toradol (ketorolac) is an intravenous nonsteroidal anti-inflammatory drug used to treat severe pain.   *See* "Ketorolac," Drugs and Supplements, NIH (available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000918) (last visited April 26, 2011).

Dr. Spiller continued to specifically address Finney's condition:

> She is prone to develop osteoarthritis due to hypermobility and a primary problem with articular cartilage, both from defective collagen in the joints. She has also experienced bilateral changes in her inner and middle ears, spontaneously became nearly deaf and requiring hearing aids for minimal functional hearing. Stickler's syndrome is also known to be associated with an increased incidence of mitral valve prolapse of the heart, and Estelle has had mitral valve repair due to an abnormal valve related to her syndrome. *Id.*

Dr. Spiller also stated that Finney carries a risk "of developing severe vision problems but so far has not experienced this." *Id.* Dr. Spiller then assessed Finney's functional limitations:

> Estelle has significant joint pain in her bilateral knees, ankles and back and is not able to stand or walk for more than 10 minutes without breaks to avoid pain. She has mild hypermobility of several joints including bilateral ankles and elbows. She performs isometric and semi-isometric exercises to try to strengthen musculature around knees, ankles, and back for stability that compensates for lack of strength from ligaments but is not able to safely lift more than 10 pounds at a time. Thus her lifting ability is severely limited. Her pain varies depending upon activity and is also unpredictable, having good days and bad days. *Id.*

Dr. Spiller concluded that no known treatment exists for a type II collagen deficiency, and that Finney is "permanently disabled . . . She is not able to regularly perform a job without having to take time off for pain, rest and recovery that cannot always be predicted." *Id.* Further, "Even in a sedentary job with flares that are difficult to control, she would have to take more than 2 days off a month for recovery, pain and symptom control." *Id.*

On June 17, 2009, Finney's counsel wrote to Dr. Spiller summarizing in the attorney's words what he understood Dr. Spiller's opinions to be and asking if she agreed. Tr. 366. The attorney stated that Finney has recently experienced worsening back pain, and "her complaints are consistent with the progression of the arthritic process related to her Stickler syndrome." *Id.* The attorney also

stated that Finney experiences symptom flares unrelated to activity, and that, "she needs the opportunity to change her position frequently and to lie down periodically to relieve pressure on her joints," especially when she experiences increased symptoms. *Id.* The letter finally asked Dr. Spiller to confirm her opinion that Finney would be unable to perform work activity on a full time basis. *Id.* Dr. Spiller wrote, "agree i [to indicate with] above," and signed the letter. Tr. 367.

Finney presented to the Emergency Room on June 19, 2009, complaining of facial pain, and was diagnosed with dental pain. Tr. 375-78. She again presented to the Emergency Room on July 26, 2009, complaining of upper right quadrant pain. Tr. 379. She was diagnosed with acute abdominal pain and a right ovarian cyst. Tr. 380. The visit represents the end of the medical record before this court, and does not show what, if any, treatment followed the episode. No limitations are noted due to these complaints.

## II.    Finney's Testimony

### A.    October 31, 2007, Function Report

Finney completed the Commissioner's "Function Report" questionnaire on October 31, 2007. Tr. 155-62. Finney first stated that she lives in a mobile home with her boyfriend and their children. Tr. 155.

Asked to describe her day, Finney wrote, "What I like to have happen but not always does" and then described rising at 6.30 a.m., sending the children to school, showering, starting household chores, making and eating lunch, napping, greeting the children after school, helping them with their homework, and getting them ready for the next day. Tr. 155. Then she wrote, "Hardly ever happens." *Id.*

Finney wrote that "we help each other keep a clean home," and that she, her boyfriend, and

their children take care of the cat, two dogs, and other small pets. Tr. 156. Finney stated that she has "always had a hard time with physical activities but pushed myself to [sic] everything I could," and that pain in her legs, back, and neck affect her sleep. *Id.* Finney did not endorse difficulties in personal care. *Id.*

Finney wrote that she posts notes around her house reminding her to take her medication, and that she prepares most household meals each day, but often burns food due to forgetfulness. Tr. 157. Regarding household chores, Finney wrote that she can do most things, but that she works in "little quantities," the work takes her longer, and she receives help. *Id.*

Finney wrote that she goes outside daily, rides in a car, and goes out alone "but I don't like to." Tr. 158. She stated, "I think it is unsafe for me to drive because I am a daydreamer and I actually forget I am behind the wheel. I am scared to drive." *Id.* Finney indicated that she shops once a month. *Id.*

Finney stated that she reads for up to twenty minutes, and must stop due to headaches "from my neck." Tr. 159. She also reported that she sews, and can walk one-quarter mile before requiring rest. *Id.* Finney stated that she "occasionally" phones or visits friends. *Id.*

Finally, Finney indicated limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, memory, completing tasks, concentrating, understanding, following instructions, and using her hands. Tr. 160. She stated that she does not follow spoken instructions well because she has difficulty hearing, but that she can pay attention "as long as I have to" depending upon "interest." *Id.* Finney also indicated she "can't handle stress," and that she has used hearing aids at all times since 1998. Tr. 161.

At the questionnaire conclusion, Finney wrote a note explaining that Stickler's syndrome is

14 - FINDINGS AND RECOMMENDATION

rare and she has not received a lot of information about caring for herself. Tr. 162. She wrote that

the syndrome affects collagen throughout her body, and that some days she can complete family

tasks before becoming exhausted at the end of the day, but other days she cannot function. *Id.*

### B.    Disability Report- Appeal

Finney completed a second disability report in conjunction with her appeal of the

Commissioner's initial denial of her claim. Tr. 170-75. It was undated, and appears to be unsigned,

but was apparently prepared after March 13, 2008 given its reference to a doctor visit on that date.

She stated that her eyesight in her left eye was changing due to astigmatism and the lenses in her eyes

are "starting to lift." Tr. 170-71. Finney also wrote, "I am unable to move properly," "bending

hurts," "I get headaches a lot due to back and neck [pain]," and that her "joints are not functioning

right." Tr. 173. She stated that headaches "come more often now" and they make her "irritable and

mean." *Id.*

### C.    Fatigue Questionnaire

Finney also completed an undated "Fatigue Questionnaire." Tr. 187-90. She stated that she

first experienced fatigue in 2000, prior to receiving open-heart surgery to repair a mitral valve

prolapse. Tr. 187. Finney wrote that her fatigue makes it "very difficult" to complete daily

activities, and that she "mostly" requires rest between activities, depending upon her activity. Tr.

187. Finney wrote that she can no longer participate in sports, and that her physicians advised her

not to do "anything that would stimulate my heart." *Id.*

Finney indicated that she can occasionally walk approximately one-quarter mile, and she does

not require help bathing or grooming. Tr. 188. She also indicated that she cleans her home daily,

does laundry weekly, shops monthly, and cooks daily, but that she requires help cleaning and

cooking.  *Id.*  Finney wrote that her boyfriend and their children help her with everything, and that she starts tasks, but has to be reminded to finish them.  *Id.*

In response to a question asking her to describe an "average day," Finney wrote that "my day is always difficult," and stated that her answer indicated "what I would love to do everyday."  Tr. 189.  Finney then described taking care of her children, sending them to school, and putting them to bed, but stated that this routine "isn't how it always goes!"  *Id.*

Finney wrote that she goes to bed early, but awakens in the night to stretch her legs, use the restroom, and drink water.  Tr. 189.  Finally, Finney stated that she is "depressed, angry, sad, [and] confused because I am not sure how my day will be or if I'll even be able to do a day with pain.  I have felt lost because of this Stickler syndrome."  Tr. 189.  She indicated that she can walk less than an hour, cannot stand or sit, and can occasionally bend, reach forward, and lift twenty pounds.  *Id.*

### D.    September 22, 2009, Hearing Testimony

Finney testified at her September 22, 2009, hearing before the ALJ.  Tr. 25-38.  Finney stated that she was thirty four at the time of the hearing, and had received a GED and completed a "little bit of college."  Tr. 25.  Finney stated that she lives with her boyfriend, his mother, and five children, two of whom are hers.  Tr. 26.  Finney testified that she wears hearing aids in both ears.  Tr. 27.

Regarding her work history, Finney testified that she last worked in August 2007, at a Thriftway deli counter.  Tr. 27.  This job ended due to Finney's "exhaustion" from working and caring for the children after work.  *Id.*  Finney stated that she "probably" could have continued working without her childcare responsibilities.  Tr. 28.  Prior to this job, Finney worked at another deli counter and at J.C. Penny's customer service department, off and on, between 1996 and 2004. *Id.*  Finney also stated that she worked at a camera shop and an ice cream parlor.  Tr. 30.

Finney testified that her "energy level" and leg pain prevents her from working.  Tr. 31.  On an average day, the pain in her legs is an "eight or nine" and she takes Percocet and Depakote for this pain, which reduces it to a "five or a three."  Tr. 32.  Finney testified that she can comfortably lift twenty to twenty-five pounds, and that she can stand for a half hour or forty-five minutes and walk fifteen or twenty minutes.  Tr. 32.  She can sit in a chair for about a half hour, and that after this her "legs get very antsy."  Tr. 32-33.

Finney also testified that she has "joint problems" in her hands, and she can hold a pen for "awhile" until her thumb hurts.  Tr. 33.  Finney explained that she does not drive because she has a "very huge phobia of cars."  *Id.*

In response to her counsel's questioning, Finney stated that she has approximately three "down" days per week, and during this time "I'm out, like I'm worthless."  Tr. 34.  Finney stated that she could not sit, stand, or lift anything on these days "because I'm in too much pain or I'm just too tired."  *Id.*  Most of the time on these days she sleeps.  Tr. 35.  On these days she may let her children care for themselves.  Tr. 36.

Finney also testified that she requires two days to recuperate from the activities of in her "normal" days, including walking fifteen to twenty minutes and sitting.  Tr. 37.

## III.    Third Party Testimony: Terry Bruce

Finney's boyfriend, Terry Bruce, submitted a third-party function report to the record on October 31, 2007.  Tr. 146-53.  Bruce wrote that Finney awakens the children, sends the children to school, and goes back to bed.  Tr. 146.  He stated that Finney "almost always" has a headache in the morning, or stomach or back pain "that prevents her from being very active throughout the day." *Id.*

Bruce wrote that Finney cares for her family "whenever she can" and that he helps her a "little bit" with everything.  Tr. 147.  He also stated that Finney's back, stomach, and leg pain interrupts her sleep, and that some days she has "no energy" to dress or care for herself.  *Id.*  Bruce indicated that Finney prepares her own food "sometimes" and that she prepares meals weekly.  Tr. 148.  Finney "can help" with most house and yard chores, including, dishes and laundry, but "gets fatigued very easily."  *Id.*  Bruce stated that Finney cannot do prolonged activity without pain and fatigue, which may "last for days and sometimes longer."  *Id.*

Bruce also wrote that "stress" causes Finney fatigue and a racing heart.  Tr. 149.  He indicated that Finney buys groceries once a month, but sometimes has to make multiple trips to the store so that she is not "over worked."  *Id.*  Bruce stated that Finney's hobbies are playing games with the kids, and that she talks with friends and family a couple of times per week.  Tr. 150.

Finally, Bruce indicated that Finney has limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, hearing, stair climbing, seeing, memory, completing tasks, concentrating, understanding, following instructions, and using her hands.  Tr. 151.  He stated that Finney's ability to walk before resting and resuming walking "depends" and that she does not follow spoken instructions well.  *Id.*  Bruce also indicated that Finney does not handle stress or changes in her routine well, and that she uses a hearing aid at all times.  Tr. 152.

## IV.    Vocational Expert's Testimony

The vocational expert at Finney's September 22, 2009 hearing stated that her testimony was consistent with the *Dictionary of Occupational Titles*.  Tr. 38.  In response to hypothetical questions from the ALJ, the vocational expert testified that an individual limited to light exertion, restricted from exposure to loud noises and use of the telephone, and without good color vision would be

unable to perform Finney's past relevant work.  Tr. 40-41.  The vocational expert  stated that such

an individual could perform work as a sorter, light packager, and advertising materials collator.  Tr.

41.

The ALJ subsequently restricted the hypothetical individual to performing one-to-three step

tasks due to fatigue, no exposure to hazards due to inability to hear them, and an opportunity to sit

and stand at will.  Tr. 41. The vocational expert stated that a hypothetical individual could still

perform the indicated occupations.  *Id.*  The vocational expert also testified that an individual

missing more than two days per month would not be able to "continue to sustain employment." Tr.

42.  Finally, in response to Finney's counsel's questioning, the vocational expert stated that a

hypothetical individual with the restrictions above, and additionally limited to no more than

occasional use of her hands for fine or gross motor movement, would be unable to sustain full-time

employment. *Id.*

## DISABILITY ANALYSIS

The Commissioner engages in a sequential process encompassing between one and five steps

in determining disability under the meaning of the Act.  20 C.F.R. §§ 404.1520; 416.920; *Bowen v.

Yuckert*, 482 U.S. 137, 140 (1987).

At step one, the ALJ determines if the claimant is performing substantial gainful activity.

If she is, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i); 416.920(a)(4)(i).  At step two,

the ALJ determines if the claimant has "a severe medically determinable physical or mental

impairment" that meets the twelve month duration requirement.  20 C.F.R. §§ 404.1509; 416.909;

404.1520(a)(4)(ii); 416.920(a)(4)(ii).  If the claimant does not have such a severe impairment, she

is not disabled.  *Id.*

At step three, the ALJ determines whether the severe impairment medically meets or equals a "listed" impairment in the regulations. 20 C.F.R. §§ 404.1520(a)(4)(iii); 416.920(a)(4)(iii). If she determines that the impairment meets or equals a listed impairment, the claimant is disabled.

If adjudication proceeds beyond step three the ALJ must first evaluate medical and other relevant evidence in assessing the claimant's residual functional capacity ("RFC"). This evaluation includes assessment of the claimant's statements regarding her impairments. 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3). The claimant's RFC is an assessment of work-related activities the claimant may still perform on a regular and continuing basis, despite limitations imposed by her impairments. 20 C.F.R. § 404.1520(e); Social Security Ruling ("SSR") 96-8p.

The ALJ uses this information to determine if the claimant can perform her past relevant work at step four. 20 C.F.R. §§ 404.1520(a)(4)(iv); 416.920(a)(4)(iv). If the claimant can perform her past relevant work, she is not disabled. If the ALJ finds that the claimant's RFC precludes performance of her past relevant work the ALJ proceeds to step five.

At step five the Commissioner must determine if the claimant is capable of performing work existing in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(f); 416.920(a)(4)(v); 416.920(f); *Yuckert*, 482 U.S. at 142; *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999). If the claimant cannot perform such work, she is disabled. *Id.*

The initial burden of establishing disability rests upon the claimant. *Tackett*, 180 F.3d at 1098. If the process reaches the fifth step, the burden shifts to the Commissioner to show that "the claimant can perform some other work that exists in the national economy, taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Id.* at 1100. If the Commissioner meets this burden the claimant is not disabled. 20 C.F.R. §§ 404.1566,

404.1520(g); 416.966; 416.920(g).

///

## THE ALJ'S FINDINGS

The ALJ found that Finney had not performed substantial gainful activity during the relevant period.  Tr. 14.  At step two, the ALJ found Finney's bilateral hearing loss and chronic musculoskeletal pain secondary to Stickler's syndrome "severe."  *Id.*  The ALJ found that these impairments did not meet or equal a listing at step three, and found that Finney retained the RFC to preform a range of light work, with the following additional limitations:

> [S]he can perform unskilled tasks that do not involve even moderate exposure to loud noises, telephone work, or hazards (e.g. unprotected heights or moving machinery) as well as only occasional public contact due to her hearing loss, which requires bilateral hearing aids; moreover, she can perform tasks that do not require high visual detail or color acuity and allow her to sit or stand at will in order to relieve pain symptoms.

Tr. 16.  The ALJ found that Finney could not perform her past relevant work at step four, but found that she could perform work in the national economy at step five.  Tr. 18-19.  The ALJ therefore found Finney not disabled under the Commissioner's regulations.  Tr. 20.

## STANDARD OF REVIEW

The reviewing court must affirm the Commissioner's decision if the Commissioner applied proper legal standards and the findings are supported by substantial evidence in the record.  42 U.S.C. § 405(g); *Batson v. Commissioner for Social Security Administration*, 359 F.3d 1190, 1193 (9th Cir. 2004).  "Substantial evidence" means "more than a mere scintilla, but less than a preponderance."  *Bray v. Comm'r of the Soc. Sec. Admin*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).  It is "such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Id.*

This court must weigh the evidence that supports and detracts from the ALJ's conclusion. *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007)(citing *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998)).   The reviewing court may not substitute its judgment for that of the Commissioner. *Id.* (citing *Robbins v. Social Security Administration*, 466 F.3d 880, 882 (9th Cir. 2006)), *see also Edlund v. Massanari*, 253 F.3d 1152, 1156 (9th Cir. 2001).   Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is a rational reading. *Id.*, *see also Batson*, 359 F.3d at 1193.

## DISCUSSION

Finney alleges that the ALJ erred by improperly assessing (1) her credibility, (2) the opinion of Dr. Spiller, and (3) the lay witness testimony.   Finney consequently asserts that the ALJ should have found her disabled at step five in the sequential proceedings.

## I.      Credibility

Finney asserts that the ALJ's credibility assessment erroneously cited her therapeutic exercises, prescriptions, and erroneously found Finney's alleged limitations due to her symptoms unsupported by the medical record.   Pl.'s Opening Br., 13-15.

### A.      Standards: Credibility

Once a claimant shows an underlying impairment which may "reasonably be expected to produce pain or other symptoms alleged," absent a finding of malingering, the ALJ must provide "clear and convincing" reasons for finding a claimant not credible. *Lingenfelter v. Astrue,* 504 F.3d 1028, 1036 (9th Cir. 2007) (citing *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).   The ALJ's credibility findings must be "sufficiently specific to permit the reviewing court to conclude

that the ALJ did not arbitrarily discredit the claimant's testimony." *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc)).  The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations. *Smolen*, 80 F.3d at 1284; *see* also SSR 96-7p at *3 (available at 1996 WL 374186).  The ALJ may additionally employ ordinary techniques of credibility evaluation, such as weighing inconsistent statements regarding symptoms by the claimant. *Smolen*, 80 F.3d at 1284.  Once a claimant establishes an impairment, the ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins*, 466 F.3d at 883.

### B.  The ALJ's Credibility Findings

The ALJ found Finney's symptom testimony "partially credible." Tr. 17.  The ALJ did not set out an identifiable credibility analysis, but instead made numerous inferences regarding Finney's credibility throughout her assessment of Finney's RFC. Tr. 16-19.  The ALJ noted Finney's hearing testimony that she could not work due to her "low energy level," and that she was limited to "standing 30-45 minutes, walking 15-20 minutes, or sitting for no more than 30 minutes before her legs begin to ache." Tr. 17.  The ALJ also cited Finney's testimony that her pain symptoms cause her to be bedridden three days per week. *Id.*  The ALJ found Finney's testimony inconsistent with the medical record (*id.*), and subsequently discussed the medical record. Tr. 17-19.

### C.  Analysis

Finney challenges the ALJ's inference that treating physician Dr. Spiller's recommendation that she perform regular non-weight bearing aerobic exercise suggests that, contrary to Finney's

testimony, she retains the "physical capacity to perform certain activities." Pl.'s Opening Br. 14 (citing Tr. 17). Finney also asserts that the ALJ erroneously assessed her testimony that she is bedridden three days per week. Pl.'s Opening Br., 14.

The ALJ specifically found that rheumatologist Dr. Ladd's recommendation that she engage in "isometric and semi-isometric" strengthening exercises contradicted this testimony. Tr. 18. While it is true that therapeutic exercise does not contradict an allegation of disability, *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001), there are at least two inferences that the ALJ may have reasonably drawn from Dr. Spiller's and Dr. Ladd's recommendations. Further, as Finney argues, the record before this court does not establish that Finney actually performed such exercises. Pl.'s Opening Br., 14. That may be true for Dr. Spiller's non-weight bearing aerobic exercise recommendation. However, Dr. Spiller himself notes that Finney "*performs* isometric and semi-isometric exercises to try to strengthen musculature around knees, ankles, and back for stability ... but is unable to lift more that 10 pounds[10] at a time." Tr. 364. These are the very exercises Dr. Ladd recommended. Not only is this relevant for its proof of what plaintiff in fact does, but the fact these two treating doctors recommend exercise suggests, as the ALJ notes, Tr. 17, what their opinions are regarding what plaintiff is capable of doing, contrary to her testimony. Last, Finney herself contradicts Dr. Spiller's 10 pound lifting limitation by testifying she can comfortably lift 20-25 pounds. Tr. 32.

This court must sustain an ALJ's credibility determination regarding activities of daily living where two reasonably plausible interpretations arise. *Rollins v. Massinari*, 261 F.3d 853, 857 (9th

---

[10] Note the disagreement with Finney's report she could lift 20 pounds occasionally. Tr. 189.

Cir. 2001). The ALJ's inference that physician recommendations that Finney perform non-weight bearing aerobic exercise or "isometric or semi-isometric" strengthening exercises to treat the effects of her collagen disorder and Dr. Spiller's statement she in fact performs the latter do indeed contradict Finney's testimony, and is therefore not based upon the record or the proper legal standards and therefore should not be not sustained.

This court may affirm an ALJ's inferences reasonably drawn from the record, *Batson v. Comm'r*, 359 F.3d 1190, 1193 (9th Cir. 2004). While the ALJ's credibility analysis is dispersed throughout the ALJ's analysis pertaining to Finney's RFC, Tr. 16-19, these discussions contain sufficient findings to sustain an inference that the medical record contradicts Finney's symptom testimony.

The ALJ noted Finney's alleged limitations in her daily activities, including being bedridden three days per week (Tr. 17). I note that at least twice in plaintiff's discussion of her daily activities, she spoke of what she wanted to do, not what she did. Tr. 189, 155. Finney made contradictory statements regarding her activities. For example, she said she can walk less than an hour, but on the same page says she cannot stand. Tr. 189. Walking without standing is contradictory. The ALJ's credibility opinion should be affirmed.

## II.    Medical Source Statements: Dr. Spiller

Finney challenges the ALJ's assessment of treating physician Dr. Spiller. Pl.'s Opening Br., 15.

### A.    Standards: Medical Source Statements

Disability opinions are reserved for the Commissioner. 20 C.F.R. §§ 404.1527(e)(1); 416.927(e)(1). When making that determination, the ALJ generally must accord greater weight to

the opinion of a treating physician than that of an examining physician. *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). The ALJ must also generally give greater weight to the opinion of an examining physician over that of a reviewing physician. *Id.* If two opinions conflict, an ALJ must give "specific and legitimate reasons" for discrediting the opinion of a treating physician in favor of that of an examining physician. *Id.* at 830. The ALJ may reject physician opinions that are "brief, conclusory, and inadequately supported by clinical findings." *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005).

### B.    Analysis

Finney specifically asserts that the ALJ erroneously assessed Dr. Spiller's suggestion that she perform strengthening exercises, and erroneously found Dr. Spiller's opinion unsupported by her treatment notes. Pl.'s Opening Br. 15-16.

### 1.    Dr. Spiller as Treating Physician

Finney asserts that Dr. Spiller should be evaluated as a "treating internal medical specialist." Pl.'s Opening Br. 15. The Commissioner does not address Dr. Spiller's role in Finney's treatment. The record shows that Dr. Spiller is a Doctor of Osteopathy, and practiced at the Samaritan Internal Medicine Clinic in Corvallis, Oregon. Tr. 340. Finney established care with Dr. Spiller on June 16, 2008, and Dr. Spiller continued to see Finney in her clinic and coordinate Finney's care between June 2008 and February 22, 2009. Tr. 340, 362. The ALJ acknowledged Dr. Spiller as a "treating physician" (Tr. 17). The treatment relationship began on June 16, 2008. Tr. 340. On forms prepared by Finney's attorney, Dr. Spiller evaluated Finney's disability on July 17, 2008 after or during only her second visit with the doctor. One must recall that Finney claims disability onset as of August 28, 2007. For that time period Dr. Spiller is at best a reviewing physician who has 10

months later begum to treat the patient.  It appears the only records Dr. Spiller reviewed were from

January 8, 2008, up to her first visit with plaintiff on June 16, 2008, and the information from

plaintiff that the doctor obtained in the July 17, 2008 visit.  The records from the June 16 and July

17 visits suggest that they were confined to evaluating her condition as of those dates in 2008 for the

most part.  Tr. 340-344, 334-335.

The ALJ must give "clear and convincing" reasons for rejecting a treating physician's

uncontradicted opinion, *Lester*, 81 F.3d at 830, so long as it is properly supported by the treatment

record.  *Bayliss*, 427 F.3d at 1216.  If the physician's opinion is contradicted, the ALJ need only give

"specific and legitimate" reasons.  *Lester*, 81 F.3d at 830.

### 2.    The ALJ's Findings Addressing Dr. Spiller's Opinion

The ALJ first cited a brief form generated by Finney's lawyer but filled out by Dr. Spiller on

July 17, 2008, stating that Finney's symptoms are attributable to her Sticker's syndrome.  Tr. 17

(citing Ex. 14F/2 (Tr. 319)).  The ALJ acknowledged that Dr. Spiller attributed Finney's complaints

of fatigue, chest pain, shortness of breath, muscle weakness, and pain to her Stickler's syndrome.

Tr. 17.  The ALJ found that Dr. Spiller's treatment notes document these complaints, but found that

Dr. Spiller's "objective findings are relatively benign."  *Id.*  Here the ALJ noted that Finney was

alert, cooperative, and had normal mood and affect, and that she exhibited "5/5" muscle strength.

*Id.*  The ALJ characterized these findings as "unremarkable," and discussed another form Dr. Spiller

completed on July 17, 2008, stating that while Finney could sit, stand or walk in the course of an

eight-hour workday, she could not do so for the entire day.  Consequently Dr. Spiller found Finney

disabled.  *Id.*  The ALJ gave this assessment little weight, finding it unsupported by Dr. Spiller's

"own objective findings" and contradicted by other evidence in the record.  *Id.*

27 - FINDINGS AND RECOMMENDATION

The record shows that Dr. Spiller completed the July 17, 2008, disability opinion approximately one month after she began treating Finney. Tr. 312-13. The opinion was expressed on forms developed by Finney's attorney, Tr. 312-13, 315, 317, 321-24. They were all filled out during the July 17, 2008 visit Finney had with Dr. Spiller. That visit lasted 15 minutes with over half the time spent counseling Finney. These forms are "brief, conclusory and inadequately supported by clinical findings," *Bayliss*, 427 F.3d at 1216.

Dr. Spiller's opinion stated that Finney has a gradually progressive collagen disorder, and presently has bone pain, fatigue, severe joint pain, shortness of breath, and weak joints. Tr. 312. She also stated (by citing numbers on the attorney's form) that Finney would be unable to sit more than thirty minutes at a time, or more than three hours in a workday, and walk more than ten minutes at a time, or more than one hour in a workday. Tr. 312.

The ALJ discusses the referral of Finney by Dr. Spiller to Dr. Ladd, the rheumatologist. Dr. Ladd notes that victims of Stickler's syndrome "are prone" to develop a variety of problems, but he finds that she (as of July 2008) did not have such symptoms. Specifically, Dr. Spiller's brief forms limit Finney's use of her hands and fingers to 10-20% of an 8 hour day. Tr. 313, 324. Dr. Ladd, a treating specialist, found no such limitation during his exam also done in July 2008. He found no joint swelling. Tr. 353. A detailed examination of her hands found no limitations. *Id.* Her wrists, shoulders, and elbows were essentially normal, *Id.*, as were examinations of the joints of her legs and feet. *Id.* He saw no evidence of osteoarthritis at the time and noted no limitations, *Id.*, which contradicts Dr. Spiller's opinions on Finney's attorney's brief conclusory forms.

The ALJ may reject physician opinions unsupported by clinical notes or findings, and where contradicted by a treating specialist. These are sufficiently clear and convincing reasons to reject at

28 - FINDINGS AND RECOMMENDATION

least these portions of Dr. Spiller's opinion. *Bayliss*, 427 F.3d at 1216 (citing *Tonapetyan v. Halter*, 242 F.3d 1142, 1149 (9th Cir. 2001). The ALJ's finding that Dr. Spiller's chart notes do not support her July 17, 2008, disability assessments is based upon the record and the proper legal standards. The ALJ's findings regarding Dr. Spiller's disability opinions should therefore be affirmed.

## III.    Lay Witness Testimony

Finney also asserts that the ALJ did not properly consider lay testimony submitted by her boyfriend, Terry Bruce. Pl.'s Opening Br., 16.

### A.    Standards: Lay Witness Testimony

The ALJ has a duty to consider lay witness testimony. 20 C.F.R. § 404.1513(d); 404.1545(a)(3); 416.945(a)(3); 416.913(d); *Lewis v. Apfel*, 236 F.3d 503, 511 (9th Cir. 2001). Friends and family members in a position to observe the claimant's symptoms and daily activities are competent to testify regarding the claimant's condition. *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). The ALJ may not reject such testimony without comment and must give reasons germane to the witness for rejecting her testimony. *Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th Cir. 1996). However, inconsistency with the medical evidence may constitute a germane reason. *Lewis*, 236 F.3d at 512. The ALJ may also reject lay testimony predicated upon the testimony of a claimant found not credible. *Valentine*, 574 F.3d at 694.

///

### B.    Analysis

The ALJ noted that Bruce "describes various functional limitations," but found them "somewhat vague" and concluded that Bruce's observations did not "provide sufficient support to alter the residual functional capacity arrived herein, since they are not fully consistent with the

medical and other evidence of record." Tr. 18.

The ALJ's assessment of lay testimony must provide reasons "germane" to the witness. *Nguyen*, 100 F.3d at 1467. The ALJ's characterization of Bruce's testimony as "vague," if accurate, is arguably "germane." However, the ALJ did not explain her finding that Bruce's testimony was "vague," and did not explain the manner in which it was inconsistent with the record. Tr. 18. The ALJ's truncated finding does not amount to sufficient analysis. This finding should not be affirmed.

Finally, the court notes that the ALJ considers lay testimony in the course of assessing a claimant's RFC. 20 C.F.R. §§ 404.1545(a)(3); 416.945(a)(3). The ALJ's rejection of Bruce's testimony because it was inconsistent with the ALJ's RFC analysis is circular. This reasoning should not be affirmed.

## IV.    The ALJ's Step Five Findings

Finney asserts that the ALJ made erroneous findings at step five in the sequential proceedings. Pl.'s Opening Br. 17-18.

After an ALJ determines that a claimant cannot perform past relevant work at step four, the ALJ must determine if the claimant can perform work in the national economy at step five. 20 C.F.R. §§ 404.1520(a)(4)(v); 416.920(a)(4)(v). If the claimant has non-exertional limitations, including environmental limitations, the ALJ must draw upon the testimony of a vocational expert to support his step five findings. *Id.* at 1102. The ALJ's questions to the vocational expert must include all properly supported limitations. *Osenbrock v. Apfel*, 240 F.3d 1157, 1165 (9th Cir. 2001).

Here, the ALJ's questions to the vocational expert relied upon the RFC expressed in the ALJ's opinion, specifically limiting Finney to light work, with less than moderate exposure to loud noises, no use of the telephone, and no requirement of high color vision acuity. Tr. 40-41. The

ALJ's analysis leading to Finney's RFC is flawed in its discussion of Finney's credibility and the lay testimony, as discussed above.   There are parts of Dr. Spiller's opinions regarding time off work to be expected that are not expressly addressed or rejected by the ALJ and which may also alter the appropriate RFC.   It may be that the ALJ intended to reject all of Dr. Spiller's opinions, but that was not clearly done.   The ALJ's RFC analysis is therefore unclear and incomplete, and this court cannot now affirm the ALJ's step five findings.

## <u>REMAND</u>

The ALJ erroneously evaluated part of Dr. Spiller's opinion and the lay witness testimony. The vocational rehabilitation testimony was therefore not based on adequate hypothetical questions. The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court.   *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000.), *cert. denied*, 531 U.S. 1038 (2000).   The issue turns on the utility of further proceedings.   A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when the record has been fully developed and the evidence is insufficient to support the Commissioner's decision.   *Strauss v. Comm'r*, 635 F.3d 1135, 1138-39 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004).   The court may not award benefits punitively, and must conduct a credit-as-true analysis to determine if a claimant is disabled under the Act.   *Id.* at 1138

Under the "crediting as true" doctrine, evidence should be credited and an immediate award of benefits directed where "(1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the

claimant disabled were such evidence credited." *Id.* The "crediting as true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett*, 340 F.3d at 876 (citing *Bunnell*, 947 F.2d at 348).

Here, the ALJ failed to properly evaluate the lay testimony, and perhaps part of Dr. Spiller's opinion. The ALJ's subsequent RFC assessment, and questions to the vocational expert, are therefore not based upon a proper foundation.

Finney's counsel elicited additional testimony from the vocational expert addressing an individual missing more than two days of work per month. Such an individual would be unable to maintain work. Tr. 42. The lay witness, Terry Bruce, testified that Finney's fatigue limits her ability to complete daily activities. Tr. 147. The cause of these limitations is unclear, as discussed above. Similarly the record does not indicate the basis for Dr. Spiller's opinion regarding Finney being likely to miss more than 4 days per month from work on the attorney's short form. Tr. 313, 324, nor does the ALJ address this opinion of Dr. Spiller. Last, this record does not indicate when this evidence suggests any period of resulting disability first began. For these reasons crediting this improperly handled evidence is insufficient to establish disability.

In such instances, an award of benefits is inappropriate. *Harman*, 211 F.3d at 1180. The matter must be remanded for further proceedings addressing the improperly evaluated evidence discussed above. *Id.* If necessary, the ALJ must then revise her RFC analysis and apply the correct medical-vocational guideline or obtain vocational expert testimony regarding Finney's workplace limitations. Finally, the ALJ must make adequate step four and five findings incorporating any revised findings. While the record below establishes Finney suffers from conditions that leave her

prone to disability, as developed, it does not establish disability exists, much less when it began.

## CONCLUSION

For these reasons, the final decision of the Commissioner should be RESERVED and REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with these Findings and Recommendation.

## SCHEDULING ORDER

The above Findings and Recommendation are referred to a United States District Judge for review. Objections, if any, are due July 26, 2011. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, any party may file a response by August 12, 2011. Review of the Findings and Recommendation will go under advisement when the response is due or filed, whichever date is earlier.

IT IS SO ORDERED.

DATED this 8th day of July, 2011.

/s/ Dennis J. Hubel

_____
Dennis James Hubel
United States Magistrate Judge

33 - FINDINGS AND RECOMMENDATION